UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JONATHAN YOURGA,<br>    Plaintiff,<br><br>v.<br><br>CITY OF NORTHAMPTON,<br>et al.,<br>    Defendants. | Civil Action No. 16-30167-MGM |

MEMORANDUM AND ORDER REGARDING MOTION FOR LEAVE TO AMEND
PLAINTIFF'S COMPLAINT
(Dkt. No. 116)

ROBERTSON, M.J.

I. INTRODUCTION

This matter is before the court on a motion by plaintiff Jonathan Yourga ("Plaintiff") for leave to amend his complaint ("Plaintiff's Motion"). The defendants oppose the motion. The court heard argument from the parties on October 1, 2018, and, for the reasons set forth below, DENIES Plaintiff's Motion for leave to amend his complaint on the ground of futility.

II. BACKGROUND

Plaintiff filed his initial complaint in the Superior Court Department of the Massachusetts Trial Court. On October 6, 2016, the defendants removed the case to this court and responded to the initial complaint by a motion to dismiss (Dkt. Nos. 1, 7). On October 27, 2016, Plaintiff filed an amended complaint which was subject to a renewed motion to dismiss by the defendants (Dkt. Nos. 17, 20). The presiding District Judge's Memorandum and Order Regarding Defendants' Motion to Dismiss summarized the factual allegations in the amended complaint as follows:

> Plaintiff began working at [Smith Vocational and Agricultural High School] full-time as an instructor in the automotive department in 1993. During 2014, his employment was governed by a Collective Bargaining Agreement ("CBA") between the Trustees and the Northampton Association of School Employees,

1

Unit D, which was in effect from July 1, 2013 through June 20, 2016. Pursuant to the CBA, Plaintiff had a three year term of employment during the period covered by the CBA and could not "be disciplined, receive a written reprimand, be reduced in rank or salary, suspended or terminated without just cause." (Am. Compl. ¶ 10 (quoting the CBA).)

In the spring of 2014, a female student complained to a school staff member that Plaintiff favored male students and had invited a male student, rather than the complaining student, to attend an out-of-school event. Though Plaintiff had previously taken a female student to a similar event, he was placed on paid administrative leave on April 8, 2014 solely on the basis of that one complaint. Although the complaint concerned gender bias, rather than a safety or criminal issue, Jeffrey Peterson, the School's Superintendent, involved the School's Director of Security, Kevin Brown ("Brown"), in the investigation and gave Brown access to Plaintiff's confidential personnel file. Plaintiff's confidential personnel file contained information about Plaintiff's receipt in 2006 of a 1985 Pontiac Parisienne. The owner had offered the car for free in the local paper and Plaintiff had responded. At the time, questions arose about whether the owner intended to give the car to Plaintiff personally or for the use of the [S]chool. A previous superintendent had investigated the incident, found no wrongdoing, and documented that finding in Plaintiff's confidential personnel file. In 2011, Plaintiff again personally accepted a vehicle. Due to its condition, that vehicle, a 1998 Nissan Altima which had been owned by a teacher at the School, was unsuitable for acceptance as a donation by the School.

On May 1, 2014, Brown and other administrators interviewed Plaintiff. During this interview Plaintiff was asked about matters unrelated to the gender bias complaint that was the stated basis for the investigation. He was not asked about his acceptance of vehicles in either 2006 or 2011. The following day, Brown, referring to Plaintiff, told another school administrator, "I think we got him." Less than a week later, on May 7, 2014, Brown contacted a Northampton Police Department detective and reported as larcenies Plaintiff's 2006 receipt of the 1985 Pontiac and 2011 receipt of the 1998 Nissan. The Northampton Police Department (the "NPD") obtained a search warrant and executed it, unannounced, at 8:25 pm on Friday May 21, 2014. They seized the 1998 Nissan. In communications with the NPD, Peterson and Brown made statements to the effect that Plaintiff had "been placed on administrative leave pending an internal investigation by the school regarding conduct with female teachers and students." (Am. Compl. ¶ 34.) The statements were recorded in a police report and reported in the media. Plaintiff was eventually charged with two counts of felony larceny. The case went to trial and Plaintiff was found not guilty as to both charges in January of 2015, though the charge related to the 2006 vehicle transfer was found to be barred by the statute of limitations.

Two days after the NPD executed the search warrant, Peterson, citing the larceny investigation, issued a notice suspending Plaintiff without pay, effective May 28, 2014. Under the CBA, Plaintiff had a right to grieve his suspension and a grievance meeting was scheduled for June 3, 2014. Peterson pressured Plaintiff to resign rather than pursue his grievance, insinuating that a resignation would

2

better protect Plaintiff's retirement benefits. Plaintiff resigned his position the
day before the grievance meeting.

*Yourga v. City of Northampton*, No. 16-cv-30167-MGM, slip op. at **2-4 (D. Mass. Mar. 10, 2017).

Plaintiff's amended complaint contained 28 counts, of which one, Count II, is relevant to Plaintiff's present motion. Count II, brought against the Trustees of the School and the City of Northampton, alleged a violation of 42 U.S.C. §1983 ("Section 1983") (Am. Compl. ¶¶ 65-73). As a basis for liability, Plaintiff alleged that the Trustees failed to monitor and control Peterson and that this failure amounted to a custom and policy that resulted in harm to Plaintiff and deprived him of his constitutional right to due process, the protection of his reputation, his right of privacy, and protection from malicious prosecution (Am. Compl. ¶¶ 50, 66-67). The presiding District Judge dismissed Count II against the Trustees and the City on the ground that Plaintiff had "failed to allege facts demonstrating, or providing a reasonable basis to infer, [that] the Trustees made. . . a deliberate choice with respect to their oversight of Peterson in the spring of 2014." *Yourga*, No. 16-cv-30167-MGM, slip op. at 10.

Plaintiff did not file a proposed second amended complaint with the instant motion. Instead, Exhibit A to Plaintiff's Motion sets out an unnumbered count, either to replace Count II or to be added as an additional count to the amended complaint, stating claims against the Trustees and the City of Northampton for violation of Section 1983. The defendants oppose Plaintiff's Motion on the grounds, *inter alia*, of futility (Dkt. No. 121).

III. DISCUSSION

1. Standard of Review

A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. A plaintiff is permitted to amend a complaint once as a matter of right prior to the filing of a responsive pleading by

3

> the defendant. Fed. R. Civ. P. 15(a). Thereafter, the permission of the court or the consent of the opposing party is required. The default rule mandates that leave to amend is to be "freely given when justice so requires," *id.*, unless the amendment "would be futile, or reward, *inter alia,* undue or intended delay." *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994).
>
> As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments (as was . . . the case here). Once a scheduling order is in place [if, as in this case, leave to amend is sought after the cut-off date established in the order], the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154-155 (1st Cir. 2004).

*Steir v. Girl Scouts of the USA,* 383 F.3d 7, 11-12 (2004) (footnote omitted); *see also Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013). The cut-off date for filing a motion for leave to amend a pleading established in the initial scheduling order in the instant case, which was docketed on May 10, 2017, was November 14, 2017 (Dkt. No. 41).

The court initially set a January 2, 2018 deadline for completion of non-expert discovery. At the parties' request, this deadline was extended to August 31, 2018, then to September 28, 2018 (Dkt. Nos. 69, 87, 105). Plaintiff's Motion was filed on August 28, 2018. Argument on the motion was heard after discovery closed (Dkt. No. 126). "If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, the accuracy of the 'futility' label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)). When leave to amend is sought after discovery has been completed "'the proposed amendment must be not only theoretically viable but also solidly grounded in the record.'" *Somascan*, 714 F.3d at 64 (quoting *Hatch*, 274 F.3d at 19 (citing *Resolution Tr. Corp. v. Gold*, 30 F.3d at 253). "Therefore, 'an amendment is properly classified as futile unless the allegations are supported by substantial

evidence.'" *Id.* (citing *Hatch*, 274 F.3d at 19). "Regardless of the context, the longer a plaintiff delays, the more likely the motion will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Steir*, 383 F.3d at 12 (citing *Acosta-Mestre v. Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 52-53 (1st Cir. 1998)). "Amendment of pleadings is largely a matter within the discretion of the district court." *Guest-Tek Interactive Entm't Inc. v. Pullen*, 731 F. Supp. 2d 80, 92 (D. Mass. 2010) (citing *Farkas v. Texas Instruments, Inc.*, 429 F.2d 849, 851 (1st Cir. 1970)).

    2. <u>Futility</u>

In support of his motion, Plaintiff contends that he has sufficiently alleged that the Trustees functioned as final policymakers regarding personnel matters at the School and that, with the benefit of recent discovery in this and, principally, in an unrelated case involving a different employee of the School, he has also sufficiently alleged a policy, practice, or custom causally connected to a violation of his constitutionally protected property and liberty interests (Dkt. No. 117 at 3-4). The defendants oppose the motion on the grounds that Plaintiff has not alleged that the Trustees and the City deprived him of a constitutionally protected right, failed to identify a policy, practice, or custom giving rise to municipal liability, and has not identified a causal connection between an alleged illegal policy, practice, or custom and the loss of his employment at the School. The defendants also argue that Plaintiff misstates the law as to the scope of the Trustees' duties and responsibilities concerning the hiring, firing, and disciplining of School employees (Dkt. No. 121).[1]

---

[1] The caption in Plaintiff's amended complaint and the allegations in the amended complaint and Exhibit A to Plaintiff's Motion, in which Plaintiff alleges repeatedly that the Trustees acted pursuant to a governmental policy, custom, or practice, show that the Trustees are sued in their official rather than their individual capacities (Dkt. Nos. 17, 116-1). *Cf. Powell v. Alexander*, 391 F.3d 1, 24 (1st Cir. 2004) (in arguing that he had sued the Pittsfield City Solicitor in her

5

"Municipalities cannot be held liable for the constitutional violation of municipal employees pursuant to the doctrine of *respondeat superior*." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) (citing *Monell*, 436 U.S. at 691). "Municipal liability requires 'both the existence of a policy or custom and a causal link between that policy and the constitutional harm.'" *Oberg v. City of Taunton*, 972 F. Supp. 2d 174, 192 (D. Mass. 2013) (quoting *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989); citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a municipal legislative body, *see e.g., Owen v. City of Independence*, 445 U.S. 622 . . . (1980), or by a person with final policymaking authority. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 . . . (1988)." *Welch*, 542 F.3d at 941-42. "[W]hile 'liability may not be imposed on a municipality for a single instance of misconduct by an official lacking final policy making authority,' liability does attach under § 1983 '"where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."'" *Meagher v. Andover Sch. Comm.*, 94 F. Supp. 3d 21, 44 (D. Mass. 2015) (quoting *Welch*, 542 F.3d at 942 (quoting *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). However, "[a] City is liable under *Monell* for the acts of a final policymaker only if those acts constitute deliberate indifference." *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005)). Further, a municipality may be liable under Section 1983 if "it

---

individual capacity, the plaintiff pointed out that he had not tried to establish that the City Solicitor had acted in accordance with a governmental policy or custom). "[S]uits against state officers in their official capacities 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Camacho-Morales v. Caldero*, 68 F. Supp. 3d 261, 273 (D.P.R. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Thus, the claim Plaintiff seeks to add by his proposed amendment, suing the Trustees in their official capacity, is properly viewed as a claim against the City of Northampton.

has a permanent and well-settled municipal custom or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury . . . ." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007).

Plaintiff has not addressed the defendants' contention that his proposed amendment fails to allege a constitutional violation. Leaving this question of whether Plaintiff has adequately alleged a violation of a constitutionally protected right for a complete briefing by all parties, the court assumes without deciding that Plaintiff has adequately alleged such a violation. The court denies Plaintiff's Motion because he has not adequately alleged and supported his claim that a municipal custom, policy or practice caused a violation of his constitutionally protected rights.

Stripped of its conclusory legal assertions, which need not be, and are not, credited, *see, e.g., Medina-Válázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014), Plaintiff's Exhibit A makes the following allegations in support of a renewed Section 1983 claim against the municipality:

- The Trustees of the School have the power to fire and supervise School employees (Exh. A, ¶ 6).
- The Trustees shared with, and delegated this authority to, the Superintendent (Peterson) and the Principal (Kelly) of the School (Exh. A, ¶ 8).
- TL, who was employed as Principal of the School in 2012-13, was not an at-will employee (Exh. A, ¶ 9).
- The Trustees interfered with TL's constitutionally protected employment rights by forcing Peterson to fire her (Exh. A, ¶¶ 19-21).
- By forcing Peterson to fire TL, the Trustees "manifested to Peterson and other . . . School administrators the existence of policies, customs, and/or practices whereby adverse employment actions and employment terminations in violation of employment contracts were accepted practices" (Exh. A, ¶ 28).
- Such a policy, custom, or practice of the Trustees "cause[d]" Kelly and Peterson to violate Plaintiff's constitutionally protected due process rights (Exh. A, ¶¶ 39-42).

- It was the policy of the Trustees to cover up their unconstitutional policies, customs or practices (Exh. A, ¶ 46).
- The municipality nonetheless had "actual or constructive knowledge" of the unconstitutional actions of the Trustees, Peterson and Kelly (Exh. A, ¶ 45).

Plaintiff has not alleged that a formal decision by a municipal legislative body was responsible for the alleged violation of his due process rights. Nor has he credibly alleged a permanent and well-settled municipal custom or practice that caused his constitutional injury. Plaintiff's factual allegations boil down to the claim that he can show that on one occasion prior to his alleged constructive discharge, Trustees of the School caused the termination of TL in violation of TL's constitutional rights. This, he claims, sufficiently alleges a municipal custom or practice that, in turn, caused Plaintiff's constitutional injury. The court disagrees. At most, Plaintiff has alleged that the Trustees violated the due process rights of one other School employee before his alleged constructive discharge. But, to maintain his Section 1983 claim against the City on the theory of a custom or practice, Plaintiff would have to satisfy the critical requirement of pointing to an unwritten municipal custom or policy that was "so well settled and widespread that the policymaking officials of the municipality can be said to have [had] either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (collecting cases). *See also Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (municipal liability may be premised on a custom which caused the plaintiff's injury "when the relevant practice is so widespread as to have the force of law" (quoting *Bd. of the Cty. Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 404 (1977)); *Turkowicz v. Town of Provincetown*, 914 F. Supp. 2d 62, 77 (D. Mass. 2012) (to show a municipality's deliberate indifference to a known risk that a plaintiff's constitutional rights would be violated, a plaintiff ordinarily must adduce a pattern of prior similar constitutional violations); *Vickowski v. Hukowicz*, 201 F. Supp. 2d 195, 214 (D. Mass. 2002) (adopting Report and Recommendation)

(to show a municipal custom or practice, plaintiff must show "'that the governmental entity's employees engaged in a continuing, widespread, persistent pattern in violation of the constitutional standard . . . .'" (quoting *Armstrong v. Lamy*, 938 F. Supp. 1018, 1035-36 (D. Mass. 1996)).

In terms of facts, Plaintiff relies a single prior instance of an alleged constitutional violation, dissimilar in many respects from the circumstances said to have injured him because it involved different decisionmakers and acts. He has pointed to no case in which such an allegation has been held sufficient to establish the requisite well-settled and widespread municipal custom or policy and the court has found no such case. In the case of *Valentino*, the Seventh Circuit held that, although the plaintiff had "present[ed] evidence of possible retaliation [in violation of First Amendment rights] against others, she [did] not show how these separate incidents w[ove] together into a cognizable [municipal] policy." 575 F.3d at 675. The same is true here. Plaintiff has pointed to one prior incident in which, he claims, another employee's due process rights were violated when her employment was terminated. His allegations do not show how the termination of T.L. could be said to establish a municipal pattern or practice of violating the due process rights of School employees in connection with personnel actions that existed prior to the termination of his employment. For these reasons, the court concludes that Plaintiff has failed adequately to allege that the constitutional injury he claims to have suffered was a result of a well-established municipal custom, policy, or practice. *See, e.g., id.; see also Silva*, 130 F.3d at 32.

As an alternative, Plaintiff has pled that the Trustees were final policymakers as to personnel decisions at the School and their treatment of T.L. caused an alleged violation of

Plaintiff's constitutional rights.[2] A fatal flaw in this contention is that, with discovery complete, Plaintiff has not alleged, and has not pointed to evidence to show, that the Trustees played any role in causing a violation of *his* constitutional rights. Assuming that, as Plaintiff contends, the Trustees qualify as final policymakers as to personnel decisions at the School, a point on which this court expresses no opinion, Plaintiff still must allege that "an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation." *Valentino*, 575 F.3d at 674 (citing *Monell*, 436 U.S. at 690; *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002)). To meet this standard, Plaintiff would have to allege – plausibly – "a 'deliberate choice to follow a course of action [] made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Rodriguez-Garcia v. Municipality of Caguas*, 495 F.3d 1, 13 (1st Cir. 2007) (quoting *Pembaur*, 475 U.S. at 481-83). He has not done so. To the contrary, the allegations in Plaintiff's amended complaint and Exhibit A lay responsibility for the termination of his employment and any associated violations of his constitutional rights squarely at the feet of Peterson and Kelly, aided by Brown. Plaintiff alleges that Peterson, aided by Brown, initiated an unwarranted investigation into aspects of his employment, that Kelly suspended Plaintiff, that Brown involved the Northampton Police Department in the School investigation, that Peterson and Brown told the police that Plaintiff had been suspended because of reports about misconduct with female students and teachers, and that Peterson suspended Plaintiff without pay, then pressured Plaintiff to resign his employment. Plaintiff alleges no facts to show that any Trustee of the School

---

[2] It is well-settled that the question of whether a municipal official has final policymaking authority is a question of state law. *See Pembaur*, 475 U.S. at 483; *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 182 (D. Mass. 2016). This court does not need to decide whether the Trustees qualify as final policymakers under state law to rule on Plaintiff's Motion and therefore does not reach the question.

10

functioned as a decisionmaker with regard to any of the events that culminated in his alleged constructive discharge. *See generally* Exhibit A, Dkt. No. 116-1. In *Welch*, the First Circuit ruled that the plaintiff had not put forth a basis for municipal liability by alleging that the Select Board had a policy of "'putting into power in the police department individuals who were known to be involved in retaliation and harassment and that this policy led to the treatment that [the plaintiff] suffered.'" 542 F.3d at 942. Plaintiff's contentions in this case are strikingly similar to the contentions that the First Circuit held in *Welch* were an insufficient basis for municipal liability. Thus, the court concludes that Plaintiff's Exhibit A does not adequately allege a *Monell* claim based on the actions of a final policymaker of the City.

Finally, to the extent Plaintiff alleges that Peterson's duties and authority included the execution of policies established by the Trustees and that Peterson exercised final decisionmaking authority based on some form of shared authority over personnel decisions (Exh. A, ¶¶ 8, 15, 17), any such contention fails under the applicable principles as set forth in *Bradshaw*, a case on which the presiding District Judge relied in his decision dismissing Plaintiff's initial Section 1983 claim against the Trustees and the City. *Yourga*, 16-cv-30167-MGM, slip op. at *10. In the *Bradshaw* case, the court stated that "even full discretion to act on a particular matter is insufficient to constitute final policymaking authority; only a complete delegation of authority to an official suffices." 203 F. Supp. 3d at 182 (citing *Pembaur*, 475 U.S. at 483 n.12). Plaintiff has not alleged complete delegation of authority to Peterson (Exh. A, ¶¶ 8, 15, 17). Accordingly, to the extent Plaintiff seeks to rely on Peterson's actions and decisions as basis for municipal liability, the allegations in Exhibit A are insufficient as a matter of law.

IV. CONCLUSION

For the reasons stated, Plaintiffs' Motion to Amend Complaint (Dkt. No. 116) is DENIED.

It is so ordered.

DATED: October 18, 2018

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge