UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JONATHAN A. YOURGA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 16-30167-MGM |
| CITY OF NORTHAMPTON, TRUSTEES | * | |
| OF THE SMITH VOCATIONAL AND | * | |
| AGRICULTURAL HIGH SCHOOL, | * | |
| JEFFREY J. PETERSON, KEVIN BROWN, | * | |
| and DOES 1-10, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 146)

July 27, 2020

MASTROIANNI, U.S.D.J.

I.     INTRODUCTION

In 2016, Plaintiff, Jonathan Yourga, a former shop teacher at Smith Vocational and

Agricultural High School (the "School"), initiated this action against defendants Jeffrey J. Peterson,

and Kevin Brown, (together, "Individual Defendants"), various other unnamed individuals ("Doe

Defendants"), the City of Northampton (the "City"), and the Trustees of the School (the "Trustees).

His complaint alleged the Individual Defendants and Doe Defendants acted out of personal malice,

and in a coordinated fashion, to manipulate a series of events, that began with a single student's,

ultimately unsubstantiated, complaint of gender bias. As a result of those actions, Plaintiff contends

he was forced to resign his position and was subjected to a malicious criminal prosecution that only

ended after he was acquitted following trial. His twenty-eight count Amended Complaint alleges the

actions of Peterson, Brown, and Doe Defendants infringed his civil rights in in violation of 42

U.S.C. § 1983 (Counts III-V) and the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, § 11I

(Counts VII-IX) constituted a variety of torts under Massachusetts law: common law conspiracy

(Count VI), invasion of privacy (Counts I-XII), intentional infliction of emotional distress (Counts

XIII-XV), defamation (Counts XVI-XVIII), interference with advantageous contractual relations

(Count XIX-XXI), common law malicious prosecution (Counts XXII-XXIV), and abuse of process

(Counts XXV-XXVII). Additionally, the Amended Complaint set out claims against the City and

Trustees for negligence in the supervision of Peterson (Count I), vicarious liability for Peterson's

alleged Constitutional violations (Count II); and breach of the covenant and good faith and fair

dealing (Count XXVIII).

Defendants filed a motion to dismiss and this court, obligated at that stage to fully credit the

factual allegations in the Amended Complaint, allowed the motion as to only Count II, the vicarious

liability claim against the City and Trustees pursuant to 42 U.S.C. § 1983. With respect to the other

claims, the court recognized that "the parties take divergent views of the factual allegations and the

narratives that can plausibly be built from these facts." (M&O re: Defs.' Mot. to Dismiss, Dkt. No.

34 at 5.) At its core, the parties' differing positions arose from a disagreement about whether

Plaintiff had alleged sufficient facts from which this court could reasonably infer the Individual

Defendants "acted together for the purpose of harming Plaintiff." (*Id.* at 6.) Following a careful

review of the facts alleged in the complaint, this court concluded that the factual allegations made by

Plaintiff – most notably the roles played by Peterson and Brown in the investigation of Plaintiff

undertaken by School personnel, the inception of the investigation as a response to a single student's

complaint of gender bias, and the severity of the actions taken against Plaintiff – provided a

sufficient basis for inferring that events were improperly driven by malice on the part of Peterson

and Brown. In reaching this conclusion, the court was careful to note that, following discovery it

could "turn out that the Amended Complaint paints an incomplete picture and other plausible explanations for the actions of Peterson and Brown will emerge when the court can consider information beyond what is contained in the Amended Complaint." (*Id.* at 7.)

Plaintiff's Amended Complaint having survived Defendant's Motion to Dismiss as to all but one claim, the parties proceeded to discovery. Plaintiff did not identify any Doe Defendants during discovery and did not uncover evidence sufficient to reinstate Count II, which had asserted a vicarious liability claim against the City and Trustees. Following the conclusion of discovery, Defendants filed their Motion for Summary Judgment as to Counts I, III, IV, VII, VIII, XIII, XIV, XVI, XVII, XXII, XXIII, XXV, XXVI, and XXVIII.[1] Armed with the parties' 56.1 Statements of Undisputed Facts, the court has revisited Plaintiff's proffered narrative – that, driven by malice, Peterson and Brown worked together to injure Plaintiff – and, for the reasons discussed below, the court will grant Defendants' Motion for Summary Judgment (Dkt. No. 146) in its entirety.

## II.   SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "[A] nonmovant can forestall summary judgment by 'present[ing] definite, competent evidence' demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). "[I]n the face of the defendant's properly supported motion for summary judgment,

---

[1] Defendants also listed Count II among the counts for which they sought summary judgment; however, Count II is the one count dismissed by this court's ruling on Defendants' Motion to Dismiss (Dkt. No. 34). Counts V, IX, XII, XV, XVIII, XXI, XXIV, and XXVII are asserted only against the Doe Defendants and Defendants have not moved for summary judgment as to Counts VI, X, XI, XIX, and XX.

the plaintiff [can]not rest on his allegations," but must present "significant probative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal citation omitted). In the District of Massachusetts, the presentation of sufficient evidence is governed by Local Rule 56.1, which provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. R. 56.1. A party opposing a motion for summary judgment has a corresponding obligation to provide the court with a concise statement of material facts that are in dispute, also tied by page references to specific "affidavits, depositions and other documentation." *Id.* Unless the opposing party identifies contrary facts supported by references to "affidavits, depositions and other documentation," the properly cited facts set out in a 56.1 statement are deemed admitted for purposes of the summary judgment motion. *Id.*; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."). Additionally, the evidence a litigant relies upon to support or dispute a fact must be able to be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

"'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.' . . . 'A fact is material if it has the potential of determining the outcome of the litigation.'" *Patco Constr. Co., Inc. v. People's United Bank,* 684 F.3d 197, 206–07 (1st Cir. 2012) (quoting *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008)). When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). However, "it is well settled that '[t]he mere existence of a scintilla of evidence'" is

insufficient to defeat a properly supported motion for summary judgment. *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson,* 477 U.S. at 252).

### III.   ASSESSING THE FACTUAL RECORD

To meet its initial burden of establishing there are no genuine issues of material fact, Defendants filed a 205-paragraph Statement of Undisputed Material Facts. *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). In most cases, such a lengthy filing, especially when, as here, many paragraphs detail actions that did not involve defendants, will not comply with Local Rule 56.1, which requires a "concise statement of the material facts of record." Here, the court accepts Defendants' 56.1 Statement because the delineation of actions undertaken by non-defendants rebuts the broad inferences Plaintiff's Amended Complaint drew from a limited set of facts that placed Peterson and, to a lesser extent, Brown, at the center of the events preceding Plaintiff's resignation. With the exception of one fact which Defendants withdrew from their 56.1 Statement in response to opposition from Plaintiff, and as discussed in more detail below, Defendants have supported the facts alleged with citations to evidence that is either admissible in the form cited or could be made admissible through witness testimony by one of Defendants' witnesses. (Defs.' Resp. to Pl.'s Rev. Resp. to Statement of Facts for the Defs.' Mot. for Summ. J. ("SOF"), Dkt. No. 176 ¶ 121.)[2]

As detailed below, the narrative presented through Defendants' 56.1 Statement deviates from the narrative set out in the Amended Complaint. Simply put, no reasonable factfinder could conclude from the facts in the SOF that the actions (or inactions) taken by the Individual Defendants or the Trustees were negligent, let alone malicious. Even when construed in the light

---

[2] Defendants' 56.1 Statement, Plaintiff's response, and Defendants' further response are all collected in Defendants' Response to Plaintiff's Revised Response to Statement of Facts for the Defendants' Motion for Summary Judgment, which the court abbreviates simply as the SOF, and all citations are to this single document. The exhibits cited by Defendants appear as exhibits to Dkt. Nos. 148 and 176 and the exhibits cited by Plaintiff correspond with the exhibits attached to Dkt. No. 169.

most favorable to Plaintiff, the SOF provides no reasonable basis for inferring that the investigation into Plaintiff's handling of School resources or to seek help from the Northampton Police Department ("NPD") was guided by malice or any other improper consideration. Peterson played a sizable, but hardly starring, role in the School investigation and Brown played a small supporting role. Neither was involved in the NPD's decisions to obtain and execute a search warrant on Plaintiff's residence or to assess the strength of the evidence recovered. The facts in Defendants' 56.1 Statement also foreclose Plaintiff's argument that he was constructively discharged or that any defendant pressured him to resign.

Once the moving party meets its initial burden, "[a] party seeking to establish a genuine issue of material fact must . . . demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists." *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005). The court, therefore, turns next to Plaintiff's response to Defendants' 56.1 Statement to determine whether Plaintiff has created a triable issue by offering additional facts or by disputing the facts offered by Defendants.

The court first considers Plaintiff's additional facts. Though discovery is complete, Plaintiff's opposition does not add facts that undercut the narrative established by Defendants' 56.1 Statement – that the Individual Defendants played limited roles in the events that unfolded during the spring of 2014. On the whole, the additional facts offered by Plaintiff are not material because they relate to actions taken by non-parties without clearly establishing a connection between those actions and Defendants. For example, Plaintiff responded to Defendants' ¶ 19, by adding twelve additional facts. (SOF at ¶ 19.) The fact asserted in ¶ 19 is that there was an exchange between Kelly and Gifford, neither of whom is a defendant, regarding Plaintiff's handling of vehicle titles. To the extent this fact is material, a debatable proposition, that status comes not from the specifics of what transpired between Kelly and Gifford, but rather the absence of involvement by either Peterson or Brown. Yet, Plaintiff has added twelve additional facts concerning how Kelly and Gifford conducted their

investigation without connecting either of the Individual Defendants to their actions or decisions. Similarly, Plaintiff added additional facts following Defendants' ¶ 192, but the additional facts concern actions taken by another non-party, Plaintiff's Union attorney, again without connecting any defendant to those actions. (*Id.* at ¶ 192.)

In other instances, Plaintiff has offered additional facts to dispute a fact offered by Defendants, but the facts offered by Plaintiff do not contradict the Defendants' fact. For example, at ¶ 73, Defendants, citing to a specific portion of Brown's deposition, wrote that "Brown's involvement in the investigation was periodic, and he completed discrete tasks as instructed by Gifford, Peterson, or Kelly." (*Id.* at ¶ 73.) Plaintiff asserts there is a genuine dispute as to the scope of Brown's involvement in the investigation and he lists eleven additional facts to support that position. However, several of these additional facts corroborate Defendants' description of Brown's role in the investigation, including Brown's testimony that he did not know who had assigned him to help with the investigation or who had left a folder of documents in his office; his inability to detail his role in the investigation or say what investigatory activities were undertaken by others; and his description of having met several times with all three administrators involved in the investigation – Gifford, Kelly, and Peterson – but did not know which administrator he was assisting during the early part of the investigation. (*Id.* at ¶¶ 73-A-D, 73-H-73I). The remainder of the additional facts offered by Plaintiff also relate to Brown's testimony that he could not remember various other details related to the investigation or his role in it when he was deposed in 2018, more than four years after the investigation. (*Id.* at ¶¶ 73-E-73-G, 73-J-73-K.) As these facts do not directly dispute the statement to which they respond, the court infers that Plaintiff offers these facts to suggest that Brown's memory gaps make him an unreliable witness.

This approach does not satisfy Plaintiff's burden to establish a material dispute because Plaintiff has not identified statements made by Brown or others that are inconsistent with Brown's

limited recollections or his statements regarding memory loss. "[E]ven when 'elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Friends of Merrymeeting Bay v. Hydro Kennebec, LLC*, 759 F.3d 30, 34 (1st Cir. 2014) (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)).

Plaintiff also disputes some of Defendants' facts by objecting to the admissibility of the evidence cited to support the fact. To the extent Plaintiff has disputed facts on the basis that the evidence cited is hearsay offered for its truth, the court finds Defendants' position, that the evidence is not being offered for its truth, but rather to demonstrate what was known to particular witnesses, more persuasive. (*See, e.g.* SOF at ¶¶ 19, 95-109.) In other cases, Plaintiff asserts evidence "is hearsay and is not competent summary judgment evidence." (*Id.* at ¶¶ 21, 26, 38, 46-56, 59, 76-81, 85.) Defendants have rebutted that argument by asserting that witnesses are available who can testify at trial.

For example, Defendant has supported a number of facts related to the School investigation with citations to a document prepared by Gifford in which she recorded information about the investigation, including notes on interviews she conducted. (*See, e.g.*, *id.* at ¶¶ 46-56.) This document was marked as an exhibit and Gifford answered questions about its contents at her deposition. (Gifford, Investigation Rep., Dkt. No. 148-9; Gifford Depo., Dkt. No. 148-5 at 24.) Plaintiff has objected to these facts on the grounds that Gifford's document cannot be used at summary judgment because it is unauthenticated and contains hearsay. While the document prepared by Gifford cannot be used at trial to prove the truth of facts contained therein, Gifford is an available witness who can testify as to her role in the investigation. Within the context of this case, the key issues relate to the reasonableness of the investigation, which largely does not turn on the truth of specific reports memorialized in Gifford's document. Further, Rule 56(c)(2) does not require that

citations at summary judgment be in admissible form, only that the evidence can be presented in an

admissible form at trial. *See also Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993). The evidence Plaintiff has

challenged with this objection can be made admissible by Defendants calling their own available

witnesses to testify at trial. Additionally, in response to Plaintiff's objections, Defendants have

supplemented the record with affidavits from the individuals Gifford interviewed, a form of

evidence rarely admissible at trial (except for impeachment), but specifically approved in Rule 56.

*See, e.g., Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 418 (1st Cir. 2017). Having reviewed

each of Plaintiff's admissibility objections, the court concludes they all lack merit.


## IV.    SUMMARY OF UNDISPUTED MATERIAL FACTS

As Peterson and Brown remain the only individual defendants, the court pays special

attention to the evidence related to their actions and the two counts asserted against the City and

Trustees – negligence in supervising Peterson (Count I) and breach of the covenant of good faith

and fair dealing with respect to an employment contract between Plaintiff and Trustees (Count

XXVIII). Despite reading closely for facts that could implicate Peterson or Brown, the vast majority

of facts offered by both parties concern actions taken by other individuals with little, and in most

cases no, involvement from Peterson or Brown.

During the 2013-2014 school year, Peterson was the superintendent of the School, John

Kelly was the interim principal, Margaret Ann Nugent Gifford was the interim vocational director,

Brown was the Director of Security, and Plaintiff was an instructor, with professional status, and

department head of the automotive technology department. (SOF, ¶¶ 5, 6, 7, 12, 13, 15, 16) Plaintiff

did not have an individual employment contract, but his employment was protected by Mass. Gen.

Laws ch. 71 and a collective bargaining agreement between the Trustees and the Northampton

Association of School Employees Unit D ("CBA"). (*Id.* at ¶¶ 7-8; CBA, Ex. 3, Dkt. No. 148-3.) The

CBA provided that "[n]o teacher with professional status will be disciplined, receive a written reprimand, be reduced in rank or salary, suspended or terminated without just cause." (SOF, ¶ 9.) Under the CBA, any claim by a teacher that terms of the CBA had been violated, misinterpreted, or misapplied was subject to a grievance procedure that would culminate with binding arbitration through the American Arbitration Association. (*Id.* at ¶¶ 10-11; CBA, Ex. 3, Dkt. No. 148-3 at Art. VI.)

On April 3, 2014, Gifford was informed by a guidance counselor that a female student had complained of gender-based favoritism by Plaintiff. (SOF, ¶ 21.) Gifford met with the student and guidance counselor that same day. (*Id.* at ¶ 22.) During that meeting, the student also complained that Plaintiff kept personal vehicles in the shop and these vehicles prevented students from working on other cars. (*Id.* at ¶ 23.) After that meeting, Gifford sent an email to Kelly in which she summarized her meeting with the student. (*Id.* at ¶ 24.) The following Monday, April 7, 2014, the student's case was discussed at an administrative team meeting attended by Gifford, Kelly, and Peterson, amongst others. (*Id.* at ¶¶ 25-26.) At the meeting Peterson directed Gifford and Kelly to investigate issues raised by the student's complaint. (*Id.* at ¶ 27.) Later the same day as the administrative meeting, Gifford and Kelly went to the automotive shop to speak with Plaintiff and observe the vehicles in the shop. (*Id.* at ¶ 28.) Kelly asked Plaintiff to explain the situation of each vehicle in the shop. (*Id.* at ¶ 31.) Of the six or seven vehicles Gifford and Kelly observed at the shop, two belonged to Plaintiff or a member of his family. (*Id.* at ¶¶ 29-30.) While at the shop, Gifford and Kelly entered Plaintiff's office and observed automobile titles. (*Id.* at ¶ 32.) Months earlier, Kelly had shared concerns about Plaintiff keeping titles in his office with Gifford. (*Id.* at ¶¶ 18-19.) However, the presence in the shop of two vehicles owned by Plaintiff (or a family member) did not violate any of the School's written policies, nor did the school have written policies requiring that automobile titles be stored in a particular manner. (*Id.* at ¶¶ 19A & 30A.)

After visiting the shop and speaking to Plaintiff, Gifford and Kelly agreed to conduct more interviews. (*Id.* at ¶ 34.) The following day, April 8, 2014, Gifford again interviewed the student who had complained about Plaintiff and learned the student had not yet been in class with Plaintiff. (*Id.* at ¶¶ 36-37.) She also learned that the student had told classmates about her complaint and believed that one or more of those classmates had told Plaintiff about it. (*Id.* at ¶ 38.) That same day, Gifford and Kelly interviewed, Illtyd Fernandez-Sierra, the other automotive technology teacher. (*Id.* at ¶ 47.) He reported a variety of concerns about Plaintiff, including concerns related to his handling of tools, his keeping personal vehicles at the shop, his tracking of work on his vehicles, his assignment of work to students, and his supervision of students. (*Id.* at ¶¶ 47-52.) Kelly also observed Plaintiff pay two invoices on his personal vehicles in the business office that day. (*Id.* at ¶¶ 55-57.) At 2:30 on April 8, 2014, Kelly placed Plaintiff on paid administrative leave at a meeting in his office. (*Id.* at ¶¶ 58-59.) Peterson was aware of the meeting before it happened and asked a representative from Plaintiff's union to attend. (*Id.* at Resp. to ¶ 60.) All the facts set out by the parties in the SOF indicate that the decision to place Plaintiff on paid administrative leave was made directly by Kelly and that when Kelly told Peterson of his decision, Peterson did not even ask Kelly about his reasons.[3] (*Id.* at ¶¶ 58-68-A.) A union representative met with Plaintiff after he received notice that he was being placed on paid leave. (*Id.* at ¶¶ 69-71.)

After Plaintiff was placed on paid administrative leave, more interviews were conducted. (*Id.* at ¶¶ 76-79.) Brown joined Gifford for interviews with two students, Fernandez, and a Collision

---

[3] At a later unemployment hearing, Kelly complained, generally, that Peterson interfered with all the actions he took as principal. (*Id.* at ¶ 67-C.) This type of general assertion is insufficient to create a dispute of fact over the specific circumstances involving the decision to place Plaintiff on paid leave. As evidenced by the citations to Kelly's deposition in the SOF, Kelly has provided several reasons for the decision to place Plaintiff on paid leave and none of the cited reasons reference interference or involvement from Peterson. Similarly, no factual dispute regarding the decision to place Plaintiff on paid leave is created by evidence that Peterson was interested in eliminating positions, including department head positions, because Kelly made the decision to place Plaintiff on paid leave.

Repair instructor. (*Id.*) Brown also sat in on several discussions about the investigation attended by Peterson, Kelly, and Gifford. (*Id.* at ¶¶ 74-75.) There is no evidence that Brown became involved in the investigation of Plaintiff before Plaintiff was placed on paid administrative leave or that it was Peterson, rather than Kelly or another administrator, who brought him into the investigation. (*Id.* at ¶¶ 72, 73-A.) There is some evidence that, once he became involved in the investigation, Brown came to believe Plaintiff was guilty of wrongdoing, but there is no evidence Brown sought to "get" Plaintiff regardless of any wrongdoing on Plaintiff's part. (*Id.* at ¶¶ 114-A, 173.)

During the investigation, Peterson and Kelly reviewed Plaintiff's personnel file.[4] (*Id.* at ¶ 86.) Brown never looked at Plaintiff's personnel file. (*Id.* at ¶ 87.) Plaintiff's personal file was not the only file on him kept at the school. (*Id.* at ¶ 92.) An additional file, sometimes referred to as the "principal's file" was maintained by prior principals who kept their own informal files of documents they felt did not rise to the level for inclusion in an employee's personnel file. (*Id.* at ¶¶ 88-89, 92.) There is a dispute as to whether the creation and maintenance of the principal's file violated the CBA, but neither Defendant is alleged to have played any role in creating or maintaining that file. (*Id.* at ¶¶ 89A-90-A.) At some point, Peterson was shown the principal's file on Plaintiff. (*Id.* at ¶ 92.)

In the course of the investigation, documents were found outside Plaintiff's personnel file related to (1) complaints made by two female teachers in 2012 regarding inappropriate interactions with Plaintiff and (2) a 2006 dispute regarding Plaintiff's sale of a Pontiac Parisienne ("Parisienne") which raised questions about whether Plaintiff had appropriated to his own use a vehicle that had been intended as a donation to the School.[5] (*Id.* at ¶¶ 90-A, 94-109.) One document related to the

---

[4] Though Plaintiff asserts this fact is disputed, the evidence cited indicates only that such a review may not have been thorough, not that it did not happen. (*Id.* at ¶¶ 86-86-F.)

[5] The court need not, and does not, take any position with respect to the truth of the contents of the documents describing the 2006 incident. For purposes of this litigation, the only relevant material fact is that the individuals investigating concerns that Plaintiff was improperly handling vehicles within the automotive shop learned of a detailed allegation that Plaintiff had previously mishandled a donated vehicle.

2006 dispute described Plaintiff obtaining the Parisienne, selling it to a teenager for $700, and the mother of that teenager contacting the School when they encountered difficulties registering the vehicle. (*Id.* at ¶¶ 95-109.) A second document was a letter to the prior owner of the Parisienne asking him to contact the superintendent ("Superintendent Letter"); a handwritten annotation at the top stated the vehicle had been returned to Plaintiff and he had refunded the teenager's money and the letter was signed by the superintendent at that time. (*Id.* ¶ 133; Ex. 61, Dkt. No. 169-25.) Kelly knew about the Superintendent Letter quite early in the investigation. (SOF, Dkt. 176 at ¶¶ 133-133B.) At his deposition, Peterson testified that he did not learn about the Superintendent Letter until later, after the NPD became involved. (*Id.* at ¶ 134.) Plaintiff asserts there is a dispute as to when Peterson learned of the Superintendent Letter, but cites no evidence that contradicts Peterson's testimony. Like Peterson, Brown has testified that he had not seen the Superintendent's Letter when he met with Moody. (*Id.* at ¶¶ 133-33B.) Plaintiff asserts Brown is not credible, but has not cited any contradictory evidence. (*Id.*)

Also during the investigation, Brown observed that several vehicles without license plates were parked on the School campus and learned of concerns about vehicle titles stored in Plaintiff's office. (*Id.* at ¶¶ 110, 115, 122.) Brown was asked by Gifford, Kelly, or Peterson how the vehicles' owners could be identified. (*Id.* at ¶ 111.) He proposed asking the NPD to use the vehicles' VIN numbers to look up the owners. (*Id.* at ¶¶ 112-13.) Brown was told to contact the NPD and he was given a folder with copies of the 2012 complaints, the first of the two documents detailing with the 2006 Parisienne incident, and vehicle titles found in Plaintiff's office to give to the NPD. (*Id.* at ¶¶ 73-B, 124-A, 128.)

On May 1, 2014, Plaintiff attended an investigatory meeting with School administrators and two Union representatives. (*Id.* at ¶¶ 80-85.) Shortly after that meeting, Kelly's involvement in the investigation of Plaintiff ceased. (*Id.* at ¶ 93.) On May 7, 2014, Brown met with Sergeant Patrick

Moody from the NPD. (*Id.* at ¶ 118.) During that meeting Brown told Moody there had been some

internal issues with Plaintiff involving his conduct with women and that during an investigation of

those issues a document had been found which suggested that in 2006 Plaintiff may have acted

wrongfully with respect a vehicle donation. (*Id.* at ¶ 119.) Brown gave Moody the documents he had

been given and asked Moody to look into the 2006 incident as well of the ownership of the vehicles

referenced in the titles. (*Id.* at ¶¶ 120, 122-23, 126.) He also provided Brown with copies of the 2012

teacher complaints, but did not ask him to look at any issues related to these complaints and did not

say anything that caused Moody to believe Plaintiff had acted in a sexually inappropriate way with

respect to female students or teachers. (*Id.* at ¶¶ 124-A, 126-27, 130-33.) Moody did not receive a

copy of the Superintendent Letter.[6] (*Id.* at ¶¶ 131, 133-42.) The SOF does not include facts

suggesting any involvement by Brown beyond this point in the investigation.

After meeting with Brown, Moody contacted two individuals identified in the document he

received regarding the 2006 events involving the Parisienne. (*Id.* at ¶¶ 143, 146.) Based on his

conversation with the original owner of the Parisienne, Moody understood the original owner had

intended to donate the Parisienne to the School. (*Id.* at ¶ 144.) Moody then searched the VIN

numbers of all vehicles that had been registered to Plaintiff and contacted the previous owners of

the vehicles (*Id.* at ¶¶ 150-51.) One of the vehicles had previously been owned by another teacher at

the School, Shannon Brisbois. (*Id.* at ¶¶ 153-54.) When Moody asked Brisbois about the vehicle, she

told him she had donated it to the School, but had signed the title over to Plaintiff so that he could

legally hold the car during the summer while the school shop was emptied for maintenance.[7] (*Id.* at

---

[6] Plaintiff takes the position that the Superintendent's Letter was exculpatory, but the letter is silent as to whether any determination was made about how Plaintiff came to possess the Parisienne. Both the prosecutor and Plaintiff possessed this document prior to his criminal trial and the prosecutor still pressed forward with the charge related to the Parisienne. (*Id.* at ¶¶ 203-05.)

[7] As with the 2006 incident, the court need not, and does not, take any position as to truth of Brisbois's description of the transfer of her vehicle because those facts are not material with respect to the claims in this case. Though Plaintiff has identified a number of facts that could be relevant to impeach Brisbois, it is

¶¶ 155-57.) Moody located the vehicle previously owned by Brisbois in the driveway of Plaintiff's residence. (*Id.* at ¶ 159.) Moody then tried to contact Plaintiff on or about May 20, 2014 and was informed by counsel for Plaintiff that Plaintiff would not speak with him. (*Id.* at ¶¶ 160-61.) The following day, May 21, 2014, Plaintiff requested counsel from the Massachusetts Teachers Association ("MTA"), referencing Moody's attempt to contact him and Moody obtained and executed a search warrant on Plaintiff's home. (*Id.* at ¶¶ 162-63.) In connection with the execution of the search warrant, the NPD took possession of the vehicle formerly owned by Brisbois. (*Id.* at ¶ 164.) Beyond the initial request that he investigate the 2006 incident involving the Parisienne and the automotive titles provided to him, the SOF includes no facts suggesting the investigatory steps taken by Moody were influenced by Brown or Peterson.

On May 23, 2018, Moody informed Peterson that he had sufficient evidence to file two criminal complaints against Plaintiff. (*Id.* at ¶ 167.) Peterson asked Moody what would usually happen next. (*Id.* at ¶ 168.) Moody told him that either the crimes could be prosecuted or the employer would handle the matter internally. (*Id.*) Peterson did not immediately tell Moody how the School wished to proceed, instead he told Moody that he would check with the Trustees and get back to Moody. (*Id.* at ¶ 169.) Peterson then spoke to the chair of the Trustees about the matter. (*Id.* at ¶¶ 170, 200.) The chair did not convene a meeting of the Trustees to consider the matter; the Trustees had no policies requiring Peterson to make a formal report to the Trustees regarding the evolving investigation and potential prosecution of Plaintiff (*Id.* at ¶¶ 170-B-F.) The chair of the Trustees told Peterson that if he believed crimes had been committed, then charges should be brought in order to protect the reputation of the school. (*Id.* at ¶¶ 171, 201.) Peterson then informed Moody that the School supported the filing of criminal charges against Plaintiff. (*Id.* at ¶¶ 172, 202.)

---

undisputed that, when contacted by Moody in 2014, Brisbois told him she had donated the vehicle to the School. The court also notes that Brisbois is not a defendant in this case nor is there any evidence that she has any relevant connection to Brown or Peterson.

Peterson also decided to suspend Plaintiff without pay. (*Id.* at ¶ 174.) The same day he spoke with Moody, Peterson provided Plaintiff with written notice of his intent to suspend Plaintiff during an in-person meeting in his office. (*Id.* at ¶¶ 175-76.) A Union representative was also present at the meeting. (*Id.* at ¶ 176.) The written notice provided to Plaintiff informed him of his statutory right to challenge his suspension at a meeting during which he could present witnesses and documents and be represented by counsel. (*Id.* at ¶ 180.)

After the meeting, Plaintiff requested the MTA appoint counsel for the meeting to challenge his suspension and sent a letter to Peterson requesting such a meeting. (*Id.* at ¶¶ 181, 183.) Union counsel for Plaintiff scheduled the meeting for June 3, 2014. (*Id.* at ¶ 184.) On May 29, 2014, while at the school on a different matter, Union counsel for Plaintiff had a brief (less than one minute) conversation with Peterson regarding Plaintiff and Peterson asked her, "why doesn't he just resign." (*Id.* at ¶¶ 187-88.) This is the only specific comment attributed to Peterson regarding Plaintiff's suspension.[8] Union counsel reported this comment to Plaintiff on June 2, 2014. (*Id.* at ¶ 188.) That night, after consulting with both his Union counsel and his personal attorney, Plaintiff sent Peterson an email resigning his position at the School.[9] (*Id.* at ¶ 194.) No further conduct by Peterson or the Trustees is set out in the SOF.

## V.   DISCUSSION

### A.  Factual Narrative at Summary Judgment

---

[8] Plaintiff asserts that his decision to resign was influenced by statements made by his Union counsel, including that Peterson could harm his pension, but there is no evidence that Peterson made such a statement to anyone. Nor does the content and context of the question Peterson did ask of Plaintiff's Union counsel, suggest Peterson intended his question to pressure Plaintiff into resigning his position. (*Id.* at ¶¶ 192-92-C.)

[9] The SOF contains several factual allegations regarding the way advice provided to Plaintiff by his Union counsel influenced his decision to resign his position. As Plaintiff's Union counsel is not a defendant in this action and no facts suggest she acted in common purpose with Peterson, none of these facts are material.

This court's decision on Defendants' Motion to Dismiss turned on the allegations in the Amended Complaint. At the motion to dismiss stage, the court was required to consider only those facts put forth by Plaintiff and, based on those limited facts, draw all reasonable inferences in Plaintiff's favor. Within the context of the limited nucleus of facts set out in the complaint, actions attributed to Peterson and Brown appeared disproportionate and inconsistent with any legitimate interests such that it was reasonable to infer there was more to the story. Construed in the light most favorable to Plaintiff, the alleged facts implied malicious intent on the part of Peterson and Brown. As it was plausible that Plaintiff would be able to prove most of his claims if he were able to prove his version of events, Plaintiff was entitled to proceed to discovery. Through the discovery process, Plaintiff has had the opportunity to uncover any evidence supporting the narrative set out in his complaint.

Now that discovery is complete and the parties have set forth all the material facts supported by evidence, the court finds itself looking at a very different set of facts. Compared to the narrative in the Amended Complaint, the roles played by Peterson and Brown are diminished, no additional co-conspirators have been identified, and the roles of non-parties are enhanced. This is true even when the facts are construed in Plaintiff's favor. For example, it is now known that Gifford conducted the initial interviews and, together with Kelly, conducted the visit to the automotive shop and Plaintiff's office. They had also previously discussed concerns about how Plaintiff handled automotive titles. Following that visit, Kelly made the decision to place Plaintiff on leave with pay and then informed Peterson of the decision.

Within the context of the enlarged set of facts, the actions attributed to Peterson and Brown no longer appear disproportionate or inconsistent with their legitimate interests and do not provide a sufficient basis from which a reasonable jury could infer malicious intent. For example, at the motion to dismiss stage, Plaintiff described the 2014 student complaint that launched the School's

investigation of Plaintiff as involving only gender bias, but it is now undisputed that the initial student complaint against Plaintiff also accused him of misappropriation of School resources. Allegations that Peterson used the documents regarding the Parisienne incident to expand the investigation of Plaintiff beyond the scope of the student complaint provided a basis for the court to infer a malicious motive or intention.[10] However, following discovery, it is undisputed that from its inception the scope of the investigation included allegations of misappropriation of School resources. As a result, there is no longer a basis to make the negative inferences that could be made at the motion to dismiss stage.

B. Immunity

1. Federal Counts

Count III and IV assert federal claims against the Individual Defendants pursuant to 42 U.S.C. § 1983. "A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts assessing the applicability of qualified immunity engage in a two-step inquiry. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). At the first step, the court considers "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation." *Id.* (quoting *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014)). The second step requires the court to determine "whether the violated right was clearly established at the

---

[10] The court notes that it need not, and, in fact, does not, take a position with respect to whether the documents describing those past incidents accurately depict Plaintiff's actions or their import. Those documents were neither created nor retained by Peterson or Brown. All that matters is whether the information contained in them could reasonably be thought relevant to the 2014 investigation.

time that the offending conduct occurred." *Id.* The court can address the steps in either order. *Id.* Dismissal is required unless the court concludes both that there has been a constitutional violation and that the violation was "sufficiently clear . . . under the specific facts of the case, [that] a reasonable defendant would have understood that he was violating the right." *Id.*

The court starts with the second step and concludes Plaintiff has not demonstrated that he had a clearly established property or liberty right that a reasonable defendant would have understood was violated by the Individual Defendants' conduct. Plaintiff claims he had a property interest in his job that entitled him to due process prior to any deprivation of that right and a liberty interest in his reputation and professional status. He asserts the Individual Defendants' actions deprived him of his property interest in his job either when he was placed on administrative leave with pay or by causing him to be constructively discharged.

With respect to Plaintiff's liberty interest, it is well established that the right can be violated "where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge." *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002). The specific basis for Plaintiff's liberty interest claim is less clear because the elements for such a claim are noticeably absent from the SOF.[11] A government employer only violates an employee's liberty interest when five elements are met. *Id.* There must (1) be stigmatizing statements made about an employee, (2) the employee must dispute the truth of the

---

[11] In his opposition to Defendants' Motion for Summary Judgment, Plaintiff argues summary judgment should not enter because "[t]he defendants make no summary judgment claims that there are undisputed facts that show that they defendants [sic] did not make 'statements about Plaintiff to the press or in a public setting,'" or that Plaintiff did not request a name clearing hearing. (Pl .Rev. Opp. To Defs.' Mot. Summ. J., Dkt. No. 170, 22.) With this argument, Plaintiff misconstrues the summary judgment burdens. When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

statements, (3) the government must have intentionally publicized the statements, (4) "the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status," and (5) the employee must have requested, and been denied, a name clearing opportunity. *Id.* The words and actions attributed to the Individual Defendants in the facts offered by Defendants and supplemented by Plaintiff fall well short of meeting these requirements. Plaintiff has not identified any statements made or publicized by Defendants, nor are there any facts that suggest Plaintiff requested and was denied a name-clearing hearing. As a result, no reasonable defendant could have understood that Peterson's or Brown's actions would violate Plaintiff's liberty interest.

The summary judgment record is also devoid of any facts which would have led a reasonable defendant to conclude that Brown or Peterson violated Plaintiff's property interest in his job. A public employee who suffers a negative employment action and can demonstrate "a cognizable property interest in his continued employment" may have an action for deprivation of property without due process. *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). The court assumes, without deciding, that Plaintiff's professional status created a property interest in his job under state law, but that the undisputed facts demonstrate that neither Individual Defendant deprived him of his employment without due process. *Kando*, 880 F.3d at 59.

Nothing in the parties' statements of fact suggests Brown played a role in the decision to suspend Plaintiff without pay or Plaintiff's decision to resign. As to Peterson, the SOF establishes that Kelly, rather than Peterson, made the decision to place Plaintiff on leave with pay and that

Peterson decided to suspend Plaintiff without pay only after he knew criminal charges would be filed against Plaintiff. The facts in the SOF do not support inferences that Plaintiff was denied due process when placed on paid leave, or when suspended without pay. Pursuant to the CBA, formal processes existed by which Plaintiff could challenge actions he believed violated, misinterpreted, or misapplied the CBA. Plaintiff was notified about his process rights and took several steps to exercise those rights. He met with a union representative immediately after being notified that he was being placed on paid leave, he requested and was assigned union counsel, and he challenged his suspension. As he navigated the grievance process, including his decision to tender his resignation before the grievance meeting, he received advice from both a privately retained attorney and union counsel. The court has difficulty identifying how Peterson's actions could have violated Plaintiff's federal rights and Plaintiff has not identified any cases in which actions similar to Peterson's deprived a former employee of their job without due process. For all these reasons, the court will dismiss Counts III and IV.

      2.   State Claims[12]

As discussed at the motion to dismiss stage, Massachusetts law protects public officers from liability for common law claims arising from their official actions. "[A] public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." *Nelson v. Salem State Coll.*, 845 N.E.2d 338, 348 (Mass. 2006). Additionally, the court must grant a presumption in favor of the public officials' honesty and motives when evaluating the sufficiency of evidence of bad faith, malice, or corruption. *South Bos. Betterment Trust Corp. v. Bos. Redev. Auth.*, 777 N.E.2d 812, 820 (Mass. 2002). While the presumption did not apply at the motion to dismiss stage, it does apply to

---

[12] Given the age and stage of this case, the court continues to exercise supplemental jurisdiction over the state law claims though granting Defendants summary judgment as to the federal claims. *Groden v. N&D Transp. Co., Inc.*, 866 F.3d 22, 31 (1st Cir. 2017).

the court's current evaluation of the sufficiency of evidence offered by Plaintiff following discovery. *Id.* at 820-21. For the reasons set forth above, the court finds that the summary judgment record is devoid of facts sufficient to overcome the presumption that Peterson and Brown acted honestly, in good faith, and in furtherance of the interests of the School during the 2014 investigation. As a result, they are entitled to summary judgment on the common law claims asserted against them in Counts VIII, XIII, XIV, XVI, XVII, XVIII, XXV, and XXVI.

C.   Remaining Counts

In addition to the federal claims and state common law claims against the Individual Defendants which are dismissed on immunity grounds, Plaintiff asserts statutory claims against Peterson and Brown under the Massachusetts Civil Rights Act ("MCRA") and a common law claim against the City and the Trustees for Breach of the Covenant of Good Faith and Fair Dealing. The MCRA claim, like the § 1983 claim discussed above, is based on Plaintiff's contention that the Individual Defendants deprived him of a liberty interest and a property interest he had in his job at the School without due process. While the MCRA claim is similar to the § 1983 claim, under the MCRA, a plaintiff must prove both that a defendant interfered with the plaintiff's exercise of a protected right and that the interference was accomplished through "threats, intimidation, or coercion." *Glovsky v. Roche Bros. Supermarkets, Inc.*, 17 N.E.3d 1026, 1035 (Mass. 2014) (internal quotation omitted). Once again, though dismissal was not appropriate given Plaintiff's careful pleading and the reasonable inferences that could draw in favor of Plaintiff's position, the changed factual landscape warrants a different outcome at summary judgment. The facts in the SOF do not include any words or actions by Peterson or Brown that rise to the level of threats, intimidation, or coercion. Indeed, the SOF does not recount any direct interactions between Brown and Plaintiff. As to Peterson, the record is almost as sparse. Peterson was present at the meetings when Plaintiff was informed he would be placed on paid leave and suspended without pay, but neither party has

attributed any words or actions to him during that time. It is undisputed that he asked why Plaintiff

did not resign, but the question was directed to his union counsel, not Plaintiff, and was asked in the

context of a brief hallway exchange out of Plaintiff's presence. Peterson did not follow the question

with any type of threat. Additionally, the same qualified immunity analysis applicable to § 1983

claims applies to MCRA claims. *Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002). Finally, as discussed

above, there is insufficient evidence of any deprivation of rights. Summary judgment in favor of the

Individual Defendants is thus appropriate with respect to the MCRA claims.

This brings the court to the two remaining claims against the City and Trustees. Consistent

with the approach taken at the motion to dismiss, the court treats the Trustees as a local school

committee established under state law and, therefore, treats the City as the real party in interest. *See*

*Doe v. Town of Blandford*, 525 N.E.2d 403, 406 (Mass. 1988). Plaintiff alleges the City is liable to him

on two theories: negligence in the training and supervision of Peterson (Count I) and breach of the

covenant of good faith and fair dealing arising out of the CBA (Count XXVIII).

Plaintiff's first claim is based on common law negligence by the Trustees for failing to

adequately supervise Peterson. He seeks damages for both emotional distress and economic loss

caused by the Trustees' allegedly negligent supervision of Peterson. Though Defendants did not

raise this argument at the motion to dismiss, they now assert Count I is preempted by the

Massachusetts Workers' Compensation Act ("MWCA"). In Massachusetts, common law claims

against an employer for personal injuries "shown to have arisen out of and in the course of . . .

employment" are generally barred by the exclusivity provisions of the MWCA. *Green v. Wyman-*

*Gordon Co.*, 664 N.E.2d 808, 813 (Mass. 1996) (internal quotations omitted). This is true even for

"bona fide personnel actions" that are not actually compensable under the MWCA. *Id.*

The court recognizes that Plaintiff has asserted the Trustees' alleged negligence caused him

both personal and economic injuries and there is no case law addressing whether claims for

economic damages are also preempted by the MWCA. However, the court need not decide whether preemption applies equally to claims for economic damages caused by an employer's negligent supervision, because the facts in the SOF do not support a claim for economic damages. The economic injuries suffered by Plaintiff were the result of his own decision to abandon his challenge to his unpaid suspension and resign his position, not any supervisory failure by the Trustees. Summary judgment in favor of Trustees is, therefore, appropriate.

Finally, Plaintiff asserts a claim against the City and the Trustees for breach of the covenant of good faith and fair dealing that attached with respect to the CBA. Summary judgment is warranted as to this claim (Count XXVIII). The CBA which governed Plaintiff's employment included mandatory grievance procedures. [T]he general rule is that the remedies specified in the agreement must be exhausted before an employee may resort to the courts. *O'Brien v. New England Tel. & Tel. Co.*, 664 N.E.2d 843, 849 (Mass. 1996). There are three recognized exceptions to this general rule applicable "where (1) 'the union has the sole power to invoke the grievance procedures and the union wrongfully refuses to process or perfunctorily handles the grievance;' (2) 'the employer repudiates the grievance procedures;' or (3) 'resort to the grievance procedures would be futile.'" *Ramirez-Lebron v. Int'l Shipping Agen., Inc.*, 593 F.3d 124, 132 (1st Cir. 2010). (quoting *Carbarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc.*, 822 F.2d 188, 192 (1st Cir. 1987)). While Plaintiff commenced a grievance under the CBA, his decision to resign prevented him from exhausting his remedies under the CBA. Plaintiff asserts that he had no choice but to resign because the stress and risks of losing the grievance proceeding were too great.

While the court is sympathetic to Plaintiff's personal assessment of the costs involved in pursuing his grievance, no court has recognized an employee's personal unwillingness to proceed with the grievance procedures set out in a collective bargaining agreement as an exception to the general exhaustion requirement. Neither the Union nor the School did anything to prevent Plaintiff's

grievance from moving forward and there are no facts suggesting the grievance procedure, especially if taken through all the available stages would have been futile. The City and Trustees are, therefore, entitled to summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing

VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion to for Summary Judgment as to Counts I, III, IV, VII, VIII, XIII, XIV, XVI, XVII, XXII, XXIII, XXV, XXVI, and XXVIII is hereby ALLOWED. Additionally, as Plaintiff has not identified any Doe Defendants, the court *sua sponte* dismisses the claims asserted against the Doe Defendants, Counts V, VI (only as to the Doe Defendants), IX, XII, XV, XVIII, XXI, XXIV, and XXVII. As Defendants have not moved for summary judgment on Counts  VI (as to Brown and Peterson), X, XI, XIX, and XX, the parties shall file a joint status report regarding these counts within twenty-one days of the date of this order.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge